IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02839-JLK

SECURITIES AND EXCHANGE COMMISSION

      Plaintiff,

v.

MICHAEL VAN GILDER,

      Defendant,

and

STEPHEN DILTZ,

      Relief Defendant.

_____

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER RE CONSENT JUDGMENT
_____

Kane, J.

On May 28, 2014, Plaintiff Securities and Exchange Commission (SEC) filed a second unopposed motion for entry of final judgments as to the above named Defendant and the Relief Defendant.[1] I deny the motion, but will approve a consent order and judgment that includes the

---

[1] I denied the first unopposed Motion For Entry of Proposed Final Judgments for a number of reasons, not the least of which is that the Motion and the Proposed Final Judgment contained appellate waivers without expressing any basis other than *ipse dixit* for it. Curiously, the instant Second Motion does not propose appellate waivers but contains a gratuitous footnote stating that "appellate waivers have been routinely upheld by the Tenth Circuit and other circuit courts." The footnote continues with a string of citations of eight cases in which appellate courts have upheld a district court's decision to impose an appellate waiver. Not a single cited case stands for the proposition that appellate waivers are mandatory. On the contrary, whether to impose an appellate waiver is a matter of judicial discretion and it is that exercise of discretion that is upheld. For the record, I have granted appellate waivers in past cases. I do not entertain the view that all appellate waivers are inappropriate. I do hold the position that judicial

detailed findings of fact expressed below and complies with the following rulings:

The case involves Van Gilder's insider trading in the securities of Delta Petroleum Corporation ("Delta"), in advance of a December 31, 2007 announcement that Tracinda Corporation ("Tracinda") was acquiring a 35 percent stake in Delta for $684 million. The Relief Defendant, Diltz, while not charged with violations of the securities laws, received gains through his personal trading in Delta securities that constitute unjust enrichment. Unjust enrichment is inferred based on the coincidence of purchases by Van Gilder through the brokerage services of Diltz, followed quickly thereafter by Diltz's purchasing Delta securities for his own account. The inference is confirmed by Diltz's consent to disgorge his profits from these trades and to pay prejudgment interest thereon.  His admission or denial of these facts, under the circumstances, is

---

discretion requires an articulable reason and none was given in this case, only resort by the SEC to a claim that "Everybody goes along with it."  If I have an opinion about appellate waivers in general it is that they are too freely granted, often without reason and as such are detrimental to effective judicial reasoning, but if a sound reason applicable to the context of the case is given, such a waiver would be considered and included if prudent to do so.

Tangentially related to the gratuitous footnote about appellate waivers, the SEC observes in another footnote (n. 12) that "[t]his Court has previously entered an order of settlement against a relief defendant where no factual findings were made and where the order contained a NAND provision."  This is correct, but misleading.  The referenced order was entered in a Ponzi scheme case after extensive hearings involving members and many victims of the scheme. The relief defendant, however, was simply the estranged spouse of one of the schemers and was wholly without knowledge of it or the harm it caused.  The instant case is an insider trading case in which a single player received and profited from insider information, enabling his unwitting stockbroker to follow suit.  The relief defendant's knowledge of the principal's conduct and the circumstances giving rise to it is relevant to the principal's liability and his own relief defendant status, thus findings and conclusions related to that knowledge and participation are necessary, in my view.  The NAND provision, on the other hand, is irrelevant and unnecessary in both cases. Relief defendants are not charged with violating the securities laws, so they have no violations to "neither admit nor deny."

2

irrelevant.

The submissions of the Plaintiff and the consents of Van Gelder and Diltz permit the following findings of fact and conclusions of law to be made under Fed. R. Civ. P. Rule 52 without the need for evidentiary hearings or trial. Rule 52 requires that the facts be found specially and the conclusions of law stated separately.

The second unopposed motion proposes that Rule 52's requirements are satisfied by the incorporation by reference of the facts in the one count of the five count criminal indictment to which Van Gilder plead guilty. According to the SEC, this is so because the facts in the criminal case and those alleged in the civil case "largely overlap." That they "largely overlap" is not the same as saying they are the same and thus incorporation by reference is insufficient and inappropriate. In *U.S. v. Merz*, 376 U.S. 192, 199 (1964), the Supreme Court emphasized that judges shall take special care in ascertaining the facts necessary to comply with Rule 52, observing that judges "will give more careful consideration to the problem if they are required to state not only the end result of their industry, but the process by which they reached it." Accepting as a substitute for this careful consideration a cavalier incorporation by reference from another case is the sort of shortcut that evades or clouds this prescription. Accordingly, I will use the allegations set forth in the adjudicated count of the indictment to make by Rule 52 findings, as well as the facts set forth in the unopposed motion, the briefs in support thereof, and the submitted consents.

## Findings of Fact

Delta is a publicly traded Delaware corporation headquartered in Denver, Colorado, and engaged in the oil and gas business. Roger Parker, during the time relevant to this case, was the

chief executive officer of Delta and the chairman of its board of directors.  Because of long-standing personal friendship, Parker tipped Van Gilder with material nonpublic information about a transaction with Tracinda, a private investment company.  Van Gilder traded on that information realizing profits.

Van Gilder's broker, Stephen Diltz, traded in Delta securities following Van Gilder's wrongful trading, earning trading profits and thus being unjustly enriched.  There is no evidence presented that Diltz had notice that Van Gilder was trading with insider information.  Criminal charges were filed against Van Gilder and he plead guilty to Count Five of the Indictment in case 12-cr-00447-WYD.  Van Gilder was sentenced to five years of probation, fined $5,000 and assessed the $100 special statutory fee.  He was ordered to forfeit $86,100 of his ill-gotten gains.  The relevant factual allegations in Count Five constitute judicial admissions by Van Gilder.

The Insider Trading Scheme

On November 8, 2007, Delta publicly announced, and filed with the SEC, a quarterly report disclosing its operational performance, revenues, earnings and other financial performance for its quarterly period ended September 30, 2007. On November 5, 2007, three days before this disclosure, the financial publication Barron's disseminated an article entitled "Day of Reckoning," which focused on Delta. The article was generally pessimistic about the company's prospects and questioned the valuation of Delta's common stock.  The article noted in particular that in five of the last seven quarters, Delta, in its quarterly reports, had missed its initial guidance figures for its oil and gas production and had "a similarly checkered history of missing analysts' earnings projections." The article further noted the company was facing cash flow problems and opined that, to address these problems, Delta would have to sell assets or obtain

external financing through stock sales or by raising debt.  Following publication of the article, the price of Delta's common stock dropped $1.49 per share, or approximately 8.8% below its prior day's closing price.

At the time, Van Gilder held both shares of Delta common stock and long-term call options to purchase Delta common stock in a Merrill Lynch brokerage account administered for him by Diltz, one the brokerage firm's Chicago, Illinois stockbrokers. On November 5, 2007, Parker sent Van Gilder an email providing an internet link to the aforementioned Barron's article.  Later that day, Van Gilder sent an email to Diltz forwarding this article link and asking Diltz to call him to discuss selling his Delta investment.

On November 5, 2007, following an exchange of emails with Diltz, Van Gilder spoke, in a series of telephone calls, with Parker who imparted that when it announced its third quarter financial performance on November 8th, Delta would report figures that would not miss third quarter forecasts and projections for its financial and operational performance.  At the time of these conversations, Delta's third quarter financial and operational performance had not yet been publicly released and was not generally known to the investing public, as Parker and Van Gilder well knew.

Based on this confidential and material non-public information, Van Gilder decided not to liquidate his Delta investment but instead contacted Diltz to buy more Delta common stock on his behalf.  On November 6, 2007, as a consequence, Van Gilder, through Diltz purchased an additional 1,250 shares of Delta common stock at $15.55 per share.

Several hours after his stock purchase, Van Gilder responded to an earlier email, counseling others as follows: "Guys - I had a dialogue a friend (sic), of whom you know.  Do

not sell this stock, rather buy more.  The article is bogus.  Delta will hit their numbers at this Thursday's announcement." Delta, in its November 8th release of 2007 third quarter results, disclosed earnings and other financial figures, and production figures, in line with or exceeding previous forecasts and predictions of production figures.

In late November 2007, a mutual friend of Parker and the owner of Tracinda discussed the possibility of Tracinda making a substantial investment in Delta.  At the time, the possibility of Tracinda's interest in Delta was confidential and not generally known to the investing public.

On November 26, 2007, following a series of telephone calls and other communications with Parker over the course of November 23, 2007 through November 25, 2007, Van Gilder contacted Diltz and, through him, purchased an additional 1,750 shares of Delta common stock at $13.87 and $13.88 per share.

On December 2, 2007, Parker spoke with representatives of Tracinda about Tracinda making a substantial equity investment in Delta.  The following day, Parker and other Delta representatives traveled to Las Vegas, Nevada, to meet with Tracinda representatives on December 10th to discuss the matter further.  Over the course of these days, Parker and Van Gilder had a series of telephone conversations and cell phone text messages, in which Parker informed Van Gilder of, and kept him apprised with respect to, the confidential negotiations between Delta and Tracinda concerning Tracinda's possible equity investment in Delta.

On Saturday, December 8, 2007, within an hour of an exchange of text messages with Parker, and as a result of his receipt of this material and confidential information, Van Gilder emailed Diltz and advised that he "wanted to buy as much Delta stock as possible" and that the two should talk the next business day.  On December 10, 2007, Van Gilder, through Diltz,

purchased an additional 4,000 shares of Delta common stock, at $17.64 per share, for his Merrill Lynch brokerage account. Within minutes of the execution of these purchases, Van Gilder spoke by telephone with a family member, who, several minutes thereafter, in turn, contacted his own stockbroker to purchase Delta common stock for his own account.

On December 17, 2007, Parker advised Delta's board of directors of his discussions with Tracinda's representatives about Tracinda's investment interest in Delta, and the board authorized Parker and the rest of its management team to proceed with negotiations with Tracinda. That evening, Parker exchanged a series of cell phone text messages with Van Gilder, and the following morning, Van Gilder telephoned Diltz. Several hours later, Van Gilder directed that $40,000 be wire transferred from a bank account to his Merrill Lynch brokerage account.

On December 19, 2007, a representative of Tracinda contacted Parker and made an offer for Tracinda to purchase a one-third interest in Delta through a purchase of Delta's common stock at $17 per share. At the time, Delta's common stock was trading at approximately $14.65 per share, and Tracinda's overture remained confidential, unknown to the investing public, as did its particular stock purchase offer. Van Gilder, through Diltz, purchased 200 call options, entitling him to purchase up to 20,000 shares of Delta common stock at $20 per share until March 22, 2008.

Over the course of December 20 through December 22, 2007, Parker had continuing confidential discussions with Tracinda's representatives concerning the terms of Tracinda's stock purchase offer. Parker, at the direction of Delta's board of directors, sought in these discussions to negotiate a higher share price for the stock purchase. On Saturday, December 22,

7

2007, as a result of these discussions, Tracinda agreed to increase its stock purchase offer to $19 per share. Tracinda's representatives indicated to Parker that this was Tracinda's final offer.

In a series of telephone calls that same day, December 22, 2007, Parker kept Van Gilder informed of the progress of these confidential discussions. Immediately following one of these telephone conversations with Parker, Van Gilder sent an email to two of his family members, its subject identified as, "Xmas present," and the email reading as follows:

> Siblings - my present (just kidding) is that I can't stress enough the opportunity right now to buy Delta Petroleum. Something significant will happen in the next 2-4 weeks.

When one of the recipients emailed him a reply asking for more details, Van Gilder sent the relative an email stating, "Call me, prefer not to have in email," and provided a telephone number. During the course of his telephone calls with Parker that day, Van Gilder also contacted Diltz to talk about Delta, exchanging a series of emails and having several telephone calls with Diltz between calls with Parker.

On December 24, 2007, based on the confidential, material non-public information about the Tracinda stock purchase offer, Diltz purchased, on Van Gilder's behalf, 3,000 more shares of Delta common stock, at prices ranging between $15.63 and 15.65 per share, and 90 additional call options to purchase up to 9,000 more shares of Delta common stock at $20 per share until March 22, 2008.

On December 28, 2007, during the course of working to finalize the Tracinda stock purchase agreement, Parker exchanged a series of cell phone text messages with Van Gilder, who then caused $272,212 from a bank account to be wired to his Merrill Lynch brokerage

account. The following day, Saturday, Van Gilder emailed Diltz requesting him to "get it on Delta asap."

On December 29, 2007, Delta's board of directors approved a finalized stock purchase agreement for Tracinda to purchase approximately 35% of Delta's common stock for $19 per share. On Monday, December 31, 2007, before the commencement of regular hours trading on the NASDAQ'S Global Select Market, Delta and Tracinda issued press releases announcing the stock purchase agreement and Tracinda's stock investment pursuant to it. Within an hour of the commencement of regular hours trading that day, acting on Van Gilder's direction, Diltz, purchased an additional 4,000 shares of Delta common stock for Van Gilder, at prices ranging from $19.28 to $19.33 per share, and 114 call options to purchase Delta common stock. By close of regular hours trading that day, Delta's common stock price had risen $3.34 from its previous close of $15.51 on December 28, 2007. Over the course of the next three trading days, its common stock price continued to rise, closing at $22.82 per share by January 4, 2008.

On January 9, 2008, acting through Diltz, Van Gilder sold the 290 call options on Delta's common stock that he had purchased between December 19 and December 24, 2007, realizing a profit of approximately $86,100 on the transaction.

In sum, Van Gilder, wrongfully using insider information, purchased 1,250 shares of Delta common stock on November 6, 2007; 4,000 shares of Delta Common stock on December 10, 2007; 200 call options on Delta Common stock on December 19, 2007; 3000 shares of Delta common stock on December 24, 2007; and 90 call options on Delta common stock on December 24, 2007. Diltz gained $50,935 profit in his personal accounts as a result of trades in Delta stock during the relevant time period.

The SEC and Van Gilder have agreed the amount of disgorgement is $109, 265 plus prejudgment interest of $22,667 for a total of $131,932.  Van Gilder, however, has already paid $86,100 in forfeiture as an incidence of his guilty plea in the criminal case.  Therefore, the amount of disgorgement agreed to is $109,265 due and owing.  In addition, the SEC has determined, and Van Gilder has agreed, on a civil penalty in the same amount as the disgorgement figure of $109,265. The SEC and Diltz agree that the profits in his personal accounts are deserving of disgorgement, plus prejudgment interest thereon in the amount of $10,840 for a total of $61,775.

## CONCLUSIONS OF LAW

### Disgorgement and Civil Penalties

I find the proposed monetary settlements are fair, adequate, and in the public interest. Based on the foregoing facts, I find the proposed settlements are reasonable and the ratio of one to one of the amount of Van Gilder's disgorgement and the proposed civil penalty is reasonable. This finding gives deference to the SEC's determination based on its experience with other insider trading cases.  The amount is neither confiscatory nor lenient and falls well within the statutorily suggested range of one to three times the amount ordered disgorged.[2]  Were the figure to be outside that range, a more searching enquiry and justification would have to be made, but within that range deference is appropriate.  Prejudgment interest is a matter of equitable discretion for the court and I find it is fair, reasonable and just in order to have the inside trader return the time value of the moneys he was illegally obtaining.  The fact that the SEC and Van

---

[2] Section 21A of the Exchange Act provides that the amount of the civil penalty "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result [of the violations]."

Gilder agree that such an award is appropriate under the circumstances of this case is persuasive.

There is no penalty requested against Mr. Diltz, nor should there be. While his conduct is sufficient to warrant disgorgement based upon unjust enrichment, there are no allegations nor evidence presented that he violated any law or rule. What is evident is that his purchases of Delta for his own account followed his purchases of Delta stock and call options for Van Gilder and are therefore related, albeit tangentially, to Van Gilder's illegal trades. But for Van Gilder's illegal insider trading, Diltz's acquisitions would not have occurred. His consent to disgorge the $51,000 by which he was unjustly enriched, and to pay $10,818 in prejudgment interest accrued on that money while under his control, for a total of $61,753, provides a sufficient, reasonable and just remedy falling squarely within the ambit of the public interest.

The Injunction Against Van Gilder

In addition to the disgorgement and penalty assessed against Van Gilder, the SEC requests an injunction of rather pervasive scope enjoining him from future violations of the Exchange Act Section 10(b) and Rule 10 b-5 thereunder. Van Gilder, of course, is prohibited from violating these laws just as much an anyone else. There are numerous ways and means of violating these provisions, but the evidence and admissions adduced show only violations by Van Gilder of engaging in insider trading. The injunction requested, even if permitted, is broader in scope than the facts justify.

When a proposed consent decree requests injunctive relief, the SEC must satisfy the four-factor test spelled out in *eBay Inc. v. MercEchange*, 547 U.S. 388, 391 (2006):

(1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to

>    compensate for that injury;
>
>    (3) that, considering the balance fo hardships between the plaintiff and the defendant, a remedy in equity is warranted; and
>
>    (4) that the public interest would not be disserved by a permanent injunction.

As stated in *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010), "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context." The Tenth Circuit has similarly stated that the traditional rules of equity apply in suits for injunction filed by the SEC. *See SEC v. Barraco*, 438 F.2d 97 (1971).

It is clear that Section 21 (d) of the Exchange Act authorizes the entry of permanent injunctions in securities cases, but it does not elide or supplant the standard criteria for issuing an injunction. To the contrary, the statute provides that

> (1) Whenever it shall appear to the Commission that any person is engaged or about to engage in acts or practices constituting a violation of the provisions of this chapter, the rules or regulations thereunder. . . . .it may in its discretion bring an action in the proper district court of the United States . . . .to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

Here, there is no basis for asserting that Van Gilder "is engaged or about to engage in acts or practices constituting a violation." There is only evidence and admissions that Van Gilder has engaged in such acts in the past. More to the point, there is no basis for ascertaining that Van Gilder represents a continuing threat or that equity should be invoked to prevent continuing violations. Further, there is no basis submitted or demonstrated for finding that Van Gilder's violations are inadequately remedied at law. This very action providing for disgorgement, interest payments and a penalty demonstrates the opposite. In addition, Van Gilder has been placed on probation in the tandem criminal case under terms that prohibit him

from further violations of the law.  Because there are adequate remedies at law, both civil and criminal, equity will not lie.  An injunction under these circumstances would be superfluous. Finally, it is not in the public interest for courts to issue injunctions on an indiscriminate basis. The nearly ageless admonition of our jurisprudence is that equitable relief should be provided sparingly and only when the law itself is shown to be inadequate.  No such showing has been made in this case.

In sum, the requested injunction is overly broad in seeking to prohibit a variety of means by which the Exchange Act and Rule 10b-5 may be violated when only one such means has been shown.  The requested injunction seeks to enjoin that which is already proscribed by law and therefore Van Gilder is already prohibited from such activities.  Both in this case and in general an existing adequate remedy at law has been applied thus precluding equitable relief.  Therefore, the request for a permanent injunction is denied.

## CONCLUSION

Similar to the action taken by Judge Bumb in *Federal Trade Commission v. Circa Direct LLC and Davidson*, 2012 WL 3987610 (D. N.J. Sept. 2012), the parties shall have until September 1, 2014, to prepare and execute a proposed consent judgment that complies with the conditional approval set forth above.  Upon receipt of a compliant consent decree, it will be approved and this matter finally laid to rest.

Dated this 17th day of July, 2014.

                                                        **s/John L. Kane**
                                                        SENIOR U.S. DISTRICT JUDGE